UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                                   CRIMINAL NO. 3:24-CR-157 (SRU)

TIMOTHY GREGORY                                       August 27, 2025

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

This is an unusual case. It centers on a deep friendship, forged through a decade and across a continent, playing Call of Duty. The first time those friends ever entered the same room was a Connecticut courtroom in this case. Pervasive throughout is a belief that participants were dealing with, or on behalf of, the Hell's Angel's Motorcycle Club. It includes an episode that resembles a plot point in Michael Mann's 1995 bank heist thriller Heat, where law enforcement was lured to an abandoned mineshaft to turn the tables of surveillance. Timothy Gregory authentically believes—accurately or not—that he is worth upwards of $80 million from crypto currency investments; but was willing to mail firearms to Connecticut for a comparatively trivial $400. It might be tempting to dismiss this as truth being stranger than fiction. But the real theme buried in these facts is Tim's challenge with reality testing: the extent to which ideas from a fictive world are synthesized into Tim's reality.

Timothy Gregory files this memorandum in anticipation of the sentencing scheduled for September 10, 2025. Mr. Gregory pled guilty to one count of illegally transferring a firearm, in violation of 18 U.S.C. §§ 933(a)(1) and 933(b), on June 5, 2025. The parties and the probation officer calculated Mr. Gregory's Criminal History Category as I. The government asserts that Mr. Gregory's total offense level is 16 for a range of 15 to 21 months. Mr. Gregory asserts that his total offense level is 14 based on U.S.S.G. § 2K2.1(b)(9), insofar as he was influenced into this offense by fear of violence and his mental health condition. The probation officer has calculated a total offense level of

22 because of the transfer of a high-capacity magazine; this would result in a sentencing range of 41-51 months. Mr. Gregory contends that the Court should impose a sentence of time served whether it be by way of guidelines analysis or a variance.

**I.      TIM WAS RAISED IN AN ABUSIVE HOME BY ADOPTIVE PARENTS, WHICH ARE PRECISELY THE TYPE OF CONDITIONS THAT GIVE RISE TO GRANDIOSITY.**

Tim says he was born in East Germany seven-and-one-half years before the fall of the Berlin Wall. He says his mother was a drug addict who went there in pursuit of the best heroin in the world, in 1982. Government records say Tim was born in Arizona.

It is clear that Tim was raised in foster care. In his journey through the foster care system, he was placed with multiple abusive families. At the age of 5, Tim was adopted by a man named Raymond Gregory. Tim says that he was adopted by a same sex couple. The year would have been 1987, the year after *Bowers v. Hardwick*, 478 U.S. 186 (1986) was decided. Notably, Arizona only permitted same-sex couples to adopt children in 2014. *See e.g.* Child Crisis Arizona, *Can LGBTQ Parents Adopt a Child From Foster Care?* (June 2, 2023), available at https://www.childcrisisaz.org/post/can-lgbtq-parents-adopt-a-child-from-foster-care. However, there is a man named Raymond Gregory who is now the mayor of Cathedral City, California following service as a city councilman and elected sheriff. This matches the description Tim gives of his adopted father. Moreover, the public record clearly indicates that Raymond Gregory is openly gay. *See* Out To Protect, *Two Openly Gay Men Appointed To Police Chief* (July 11, 2010), available at https://outtoprotect.org/two-openly-gay-men-appointed-to-police-chief/.    Tim    says    Raymond physically abused him because he was bullied at work, in the police force, on account of his sexual orientation. Tim believes Raymond then took that moral injury out on his kids.

While some of the details appear odd, Tim has little motive to fabricate this history.[1] Importantly, he told counsel who his adoptive father was the day counsel met him. He has been incarcerated since then with no access to the internet. Counsel's operative theory is Tim was adopted by Raymond, but given the social and political climate of that time, there was a dimension of secrecy, stigma, and fear to their lives. Moreover, counsel's reading on adoption indicates that single people may adopt children, but that it can be very difficult for single men to do so, and they generally have to be willing to adopt older children. Given that Tim entered his adoptive family at the age of 5 from a profoundly broken background, this had to be an extraordinarily difficult formative moment for an unconventional family unit. Moreover, this case would have been vastly simpler had Tim had anyone in his life who could have provided him support or assisted with residency (other than Tyler Porter).

There is a connection between childhood trauma and delusions. *See, e.g.,* Thomas Bailey et al., *Childhood Trauma Is Associated With Severity of Hallucinations and Delusions in Psychotic Disorders: A Systematic Review and Meta-Analysis* (2018), Schizophrenia Bulletin, Vol. 44 No. 5 pp. 1111-1122 (*Exhibit* A). A meta-analysis of the literature states: "There is now considerable evidence that childhood trauma, including exposures such as sexual, physical, and emotional abuse, and neglect is a risk factor for psychotic disorder, with emerging evidence supporting childhood trauma as a causal risk factor for psychotic symptoms and disorder." *Id*. at 1111. "Delusions have been conceptualized as developing as a result of childhood trauma via biased threat beliefs, stemming from

---

[1] The Cathedral City town website has a biography of Mayor Gregory which states that he has two grown children and one grandchild. Available at https://www.cathedralcity.gov/Home/Components/StaffDirectory/StaffDirectory/151/1746?alpha=G (last visited Aug. 27, 2025).

trauma-related negative beliefs about self and others. A more specific version of this theory posits that persecutory delusions develop as a consequence of early parental neglect, which impacts attachment, and leads to mistrust of others. These models have some empirical support." *Id.*

One can imagine a straight line between Tim's childhood circumstances and his adult persona. To the extent that delusions can operate as a band-aid over the pain, shame, and humiliation of childhood trauma, Tim's grandiosity is precisely that. Tim earnestly seizes the drama, flair, or color in many of the most mundane circumstances. It is not unlike a small child who begins a story, unsure of his communicative ability, but simply continues telling the story based upon the rise he gets from his audience and the power he feels from enrapturing others. While this trait is not uncommon in young children, imagine a child who has no longitudinal relationship with an adult to correct inaccuracies or offer reality testing at appropriate times. Imagine further that that child must deal with shame, pain, and instability. The power of narrative would be the only power, or continuity, he has in his life at that point. At some point, as we forget many of the precise details of our childhoods and our collection of experience simply becomes who we are and always have been, that person is no longer able to recall when his grandiosity became an unconscious part of his personality rather than a childhood adaptation against danger, real or perceived. That is Tim.

Dr. Kathryn Thomas, a research and writing attorney and clinical psychologist in the Federal Defender's Office met with Tim in conjunction with this case. *Exhibit* B. While she indicated that a comprehensive mental health evaluation was warranted, she stated that Tim's reported history of mental health challenges "appear consistent with delusions." *Id.* ¶ 12. While she left diagnosing Tim to a comprehensive evaluation, she noted that his presentation certainly appears consistent with delusions. Notably, he also has insight into the eccentricity of some of his beliefs, which may help explain how he has lived a mostly law-abiding and functional life but for this case.

4

Indeed, Tim does have eccentric beliefs that challenge reason and reality. Consider one recent example for which the Court will have some frame of reference. The defense filed a bond motion and bond appeal in the Spring. The Court sustained Judge Spector's denial of bond on the ground that the government proffered information where Mr. Gregory said he would go live in Australia were authorities to try to apprehend him. Though deeply frustrated and disappointed the day of the ruling, that quickly turned to bemusement with the legal system and the way it portrayed him. In good and humorous spirits at the Wyatt the week later,[2] Tim calmly discussed the ruling. He said "that judge thought I would flee to Australia. That's crazy! I could never live in Australia! They have the six most deadly, poisonous snakes in the world in Australia." It never occurred to counsel to make that argument.

The issue for Tim is reality testing. In a vacuum, many of his eccentricities are charming, quirky, or innocuous at worst. However, in a higher stakes environment and faced with guile or manipulation, Tim struggles to process whatever façade that person puts up to the world. According to the American Psychological Association's Dictionary of Psychology, "reality testing" means "any means by which an individual determines and assesses their limitations in the face of biological, physiological, social, or environmental actualities or exigencies. It enables the individual to distinguish between self and nonself and between fantasy and real life. Defective reality testing is the major feature of psychosis." Available at https://dictionary.apa.org/reality-testing. This is what Tim lacks.

---

[2] Were this a sour grapes story, counsel would not share it.

Finally, the only real family connection Tim has is a young daughter. Counsel's understanding is that she has a profound and rare genetic disability. Nonetheless, it is clear that Tim adores her and is devoted to her. Recently, he was crestfallen because his rights to her were terminated. This did not happen on the merits but because of default. While counsel does not have documents from the Colorado family court, he can represent that his investigator contacted that court and confirmed the existence of a family case. He explained that Tim was incarcerated at Wyatt, and they agreed to continue the matter for 60 days to allow for Wyatt to facilitate Tim's attendance via video call. However, on the court date, Tim's counselor was out and did not place him in the video room at Wyatt for the call. Accordingly, a default judgment was entered against him, and he lost his rights to her. Importantly, Tim cites keeping his daughter safe as the primary motivation for doing as he did.

Timothy Gregory is a well-meaning but eccentric man who is virtually alone. A lifetime of isolation has left him with deficits in his ability to gauge reality. However, Tim has the insight and motivation to work on this challenge and with the right help he can do so.

## II.    MR. GREGORY'S TOTAL OFFENSE LEVEL SHOULD BE 14 TO ACCOUNT FOR HIS PERSONAL CHARACTERISTICS.

The correct Guidelines offense level is 14 as contemplated by the defense calculation in the plea agreement. This is so because it accounts for Tim's mental health issues and the fears he apprehended from the gun purchaser. First, the Court should not apply the 5 point high-capacity magazine enhancement identified by probation. It should decline to do so on account of (1) *United States v. Fernandez* and the plea agreement; (2) the fact that "high-capacity magazine" is unconstitutionally vague; and (3) the fact that different states have different laws concerning these items and New Mexico permits them. Second, it should decrease Mr. Gregory's total offense by *at*

*least* 2 levels pursuant to U.S.S.G. § 2K2.1(b)(9) insofar as Mr. Gregory has a mental condition making him unusually susceptible to influence of others and was motived by a familial relationship.

### A.  The High-Capacity Magazine Enhancement Should Not Apply.

The Court should not apply the high-capacity magazine enhancement set forth in U.S.S.G. § 2K2.1(a)(4)(B). First, the Court should simply depart downward pursuant to *United States v. Fernandez* and honor the plea agreement. Second, to the extent that it might, hypothetically apply, it is unconstitutionally vague. There is no settled, universally applicable definition for high-capacity magazines. In the Guidelines, it is defined in the comments, not in the actual provision of law. U.S.S.G. § 2K2.1 cmt. 2. While high-capacity magazines are illegal in Connecticut, they were not illegal in New Mexico. *See* Everytown For Gun Safety, *Which states prohibit high-capacity magazines?* (Jan. 15, 2025), available at https://everytownresearch.org/rankings/law/high-capacity-magazines-prohibited/. It is not clearly settled what a "high-capacity magazine" is as a legal matter. Similarly, there exists a *Kimbrough* argument insofar as (1) this country is undoubtedly awash in gun violence; (2) much of it is accomplished with highly dangerous guns that are legally but recklessly sold; (3) Congress has affirmatively protected, through federal preemption, the profits of gun manufactures who engage in this type of business by way of the Protection Of Lawful Commerce In Arms Act; and (4) it undermines respect for the law where only a discreet and arbitrary class of these weapons are actually prohibited by law. *See Defendant's Memorandum in Aid of Sentencing*, *United States v. DeFelice*, 3:23-cr-116(MPS), Doc. No. 58 at 11-19; *Defendant's Memorandum in Aid of Sentencing*, *United States v. Vasquez*, 3:22-cr-9(SALM), Doc No. 68 at 15. The high-capacity magazine enhancement should not apply in this case.

**B. A Two to Four Point Departure Is Warranted Pursuant to U.S.S.G. § 2K2.1(9)(C)(i) and (ii).**

Mr. Gregory was both motivated to commit the offense by a familial relationship and fear of violence; and was unusually vulnerable to persuasion to commit this offense due to mental condition. Accordingly, at least a two-point departure is warranted.

Not only has Dr. Thomas indicated that Mr. Gregory likely suffers from delusions or delusional disorder, evidence in support of that conclusion is splashed across this case. Mr. Gregory: may or may not by a crypto-currency tycoon; has stage four cancer that has not been treated in 18 years; will not flee to Australia because of his fear of snakes; and contemplates treating his cancer with Ivermectin. Dr. Thomas has summarized the research regarding delusions which makes plain that people who suffer from these disorders suffer diminished cognitive functions. *Exhibit* B ¶ 11.

Second, Mr. Gregory and Mr. Porter maintain that the person to whom Mr. Gregory sold the guns threatened their children. Mr. Porter and his wife have submitted affidavits describing the source's reputation for violence and threatening behavior in the neighborhood. *Exhibit* C. Moreover, the PSR and the offense conduct make clear that Mr. Gregory believed the source was a convicted felon; and Mr. Gregory believed that his "uncle's people" were the Hell's Angels Motorcycle Club. Gregory and Porter maintain that there are text or Facebook messages indicating this which were deleted or unsent. While counsel has struggled to decipher this evidence, the critical fact is that Mr. Gregory perceived a threat. Moreover, his closet confident—Porter—also perceived a threat and he is the one who most informs Mr. Gregory's worldview.

This evidence together and separately demonstrates that Mr. Gregory committed the offense out of fear and suggestibility. Believing he was worth in excess of $80 million, Mr. Gregory had no motive to sell a gun on the East Coast for $400 dollars. Clearly, there was an ulterior motive: that

8

motive was fear and a total misapprehension of reality. Accordingly, a downward departure is warranted.

### III.     A SENTENCE OF TIME SERVED IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE THE PURPOSE OF THE LAW.

A sentence of thirteen months and 19 days is sufficient but not greater than necessary to serve the law's purpose. This is so whether the Court does so pursuant to Mr. Gregory's Guidelines rationale or by way of a Guidelines sentence.

First, a sentence of more than one year for a person who has not previously served time serves a significant deterrent purpose. It communicates to the public that weapons violations are not mere "paperwork" offenses. Similarly, it demonstrates the seriousness of the offense while also accounting for Mr. Gregory's unique circumstances. Moreover, the requested sentence is tantamount to a level 14 Guidelines sentence because he will receive no good time credit as a pretrial detainee. Were this sentence imposed the day he entered custody, or were he at liberty during this case, a sentence of approximately 16 months would result in the same amount of real time served.

Second, this sentence specifically deters Mr. Gregory. Not only has he been taught a lesson, he is now incapacitated insofar as his felony conviction renders him a prohibited person. He cannot lawfully buy a gun to transfer any longer. The Supreme Court has recognized that the mere fact of conviction is inherently punitive noting the "'societal stigma accompanying any criminal conviction.'" *Rutledge v. United States*, 517 U.S. 292, 302 (1996) (quoting *Ball v. United States*, 395 U.S. 856, 864 (1980)). This is particularly true in the context of gun cases because a person's Second Amendment privileges are part and parcel of the constitutional rights forfeited upon conviction. In addition to the customary prohibitions on firearms possession flowing from the court's supervisory authority, felons

forever lose their firearms rights, which is a deprivation of unique consequence to gun owners. This is punitive and has deterrent value.

Third, a sentence of this length that also includes a mandatory mental health evaluation and treatment rehabilitates Mr. Gregory. This case—whether the Court accepts Mr. Gregory's Guidelines analysis or not—is a product of grandiosity and isolation. Mr. Gregory hopes to return to Eugene, Oregon (where he was arrested) upon his release. Be his supervision in Oregon or New Mexico, probation can facilitate stability with Second Chance funds that assist with residency and connection to appropriate mental health services. Tim has the insight and interest to succeed and will do so with some assistance.

Finally, this sentence would not lead to unwarranted disparities. The PSR recites JSIN data for a total offense level 20. ¶ 100. It is clear that downward departures, a few seemingly including probation, are not unusual in this context. Similarly, 15 months is both the average and median sentence in the total offense level 14, CHC 1 cohort; and the average was 20 months with a median of 18 in the level 16, CHC I cohort. In the higher group, 2 defendants received probation. This proposed sentence is well in line with this data. Any disparity one might point to is well *warranted*.

## IV.    CONCLUSION.

Nietzsche famously wrote that "if you gaze long enough into an abyss, the abyss will gaze into you." Tim grew up in the abyss and the adaptation that permitted him to survive it was grandiosity. Given the absence of serious guidance or support in his life, he never matured nor had that grandiosity challenged. When a rouse marked by grandiosity but conceived by federal law enforcement—for legitimate purposes—entered Tim's limited and eccentric social circle, the abyss stared back: Tim was faced with a dark reality to which he was ill equipped to respond. Rather than dismiss it for what it was, he responded the only way he knew how: more grandiosity and one-ups-men-ship. Whatever

10

stability he had he lost as he was held in the abyss of prison. But with the tools that federal probation can provide, Tim can constructively soothe the wounds of his childhood and lead a law-abiding life. A sentence of time served with appropriate conditions will do that: it is sufficient but not greater than necessary.

Respectfully submitted,

THE DEFENDANT,
Timothy Gregory

OFFICE OF THE FEDERAL DEFENDER

Dated: August 27, 2025          */s/ Daniel M. Erwin*
Daniel M. Erwin
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct28947
Email: Daniel_Erwin@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 27, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Daniel M. Erwin*
Daniel M. Erwin

11