UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    CRIMINAL NO: 3:24cr157(SRU)(RMS)

v.

TIMOTHY GREGORY                             September 3, 2025

**<u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>**

The characteristics of the defendant in this case are, without question, unusual.  Defendant Timothy Gregory's personal history and reported mental health struggles have been documented at length by the defense.  But while defendant's personal history and eccentricities may be unusual, they do not obscure the straightforward facts of this case.  Gregory chose to illegally traffic firearms into Connecticut, including high-capacity magazines and an AR-style rifle, to an individual that he knew was legally barred from possessing them. Such conduct is neither quirky or harmless.  It is inherently dangerous, undermines the very laws designed to keep communities safe, and poses a direct and substantial threat to the public safety of the community. Regardless of defendant's idiosyncrasies or beliefs that may or may not comport with reality, the fact is that he knowingly and willingly trafficked firearms into the District of Connecticut, an offense that facilitates violence, endangers communities, and warrants a significant term of incarceration, followed by a supervised release with robust conditions that address Gregory's potential mental health concerns.

Thus, for the reasons detailed below, the Government asks that the Court adopt the findings of fact in the Presentence Report ("PSR") and submits that a sentence at the top the Guidelines range contemplated by the Government would be appropriate and "sufficient, but not

greater than necessary, to reflect the seriousness of the offense, promote deterrence and uphold respect for the law, protect the public, and encourage rehabilitation.

## I.    BACKGROUND

### A.    Procedural History

On July 16, 2024, Gregory was charged and arrested by criminal complaint alleging violations of 18 U.S.C. §§ 933(a), firearms trafficking, 922(a)(5), unlawful transfer of a firearm to an out-of-state resident, 18 U.S.C. § 922(d), unlawful sale or transfer of firearms, and 18 U.S.C. § 1715, mailing non-mailable firearms. Dkt. No. 1. On the same date, Gregory was presented before United States Magistrate Judge for the District of Mark D. Clarke and ordered detained. *See* 6:24mj152. On July 31, 2024, a New Haven grand jury returned an indictment, charging Gregory with violations of 18 U.S.C. §§ 933(a)(1), 932(a), and 933(b), firearms trafficking; 18 U.S.C. §§ 922(a)(5) and 924(a)(1)(D), unlawful transfer of a firearm to an out-of-state resident; and 18 U.S.C. § 1715, mailing non-mailable firearms. Dkt. No. 8. Gregory was thereafter transferred to the District of Connecticut, and on September 12, 2024, presented in the District of Connecticut before United States Magistrate Judge Robert M. Spector and ordered detained. Dkt. No. 16-17. Defendant has been in custody since his arrest in July 2024.

### B.    Underlying Facts

A detailed recitation of the undisputed facts appears in the PSR paragraphs 6 to 21, therefore only a summary of the relevant facts appears below.

Greogry was charged and pleaded guilty to selling and shipping two firearms from New Mexico to Connecticut on two separate occasions, through the United States Postal Service to an individual that Gregory knew was a previously convicted felon and prohibited from lawfully possessing firearms. The recipient of the firearms—an FBI confidential source—had been

introduced to Gregory through a mutual acquaintance in Connecticut, to whom Gregory had been mailing marijuana and THC. The source communicated with Gregory via Facebook messenger and video to discuss the purchase and shipment of firearms, ultimately culminating in the sale of two firearms on or about May 7, 2024 and June 20, 2024. During the communications, the source made clear that he was purchasing the firearms for himself and also seeking firearms to resell to his "uncles ppl."

The first of those shipments contained a Glock 42 .380 caliber pistol and three magazines. The second contained containing a .223 caliber AR15 style rifle with serial number JACK11972 and two empty thirty-round magazines.[1] The confidential source paid Gregory a total of $2,900 for the firearms and magazines, which the source made through cash to an intermediary, who then sent Gregory payment through Venmo, and later through Western Union money order directly to Gregory. Some of the payment (i.e. $2,500) had been made upfront for four pistols, one of which was ultimately shipped to Connecticut. On both occasions, Gregory communicated directly with the source via Facebook Messenger, and sent photographs of the firearms prior to shipment, tracking information, and confirmation of payment. Significantly, during the communications, Gregory also sent the source photographs of what appeared to be fully automatic firearms and offered to sell the source "switches," i.e. attachments that convert semi-automatic firearms to fully automatic, for the firearms.

Following these two shipments, Gregory and the source discussed the sale of additional firearms to the source's uncle, a supposed member of the Hells Angels. Specifically, Gregory indicated to the source that he had up to 300 weapons, some of which were fully automatic, hidden

---

[1] In preparing the plea agreement, the Government had inadvertently overlooked the high-capacity magazines in calculating Gregory's base offense level and agrees with Probation's assessment.

in a mine shaft in Colorado and available for sale. Gregory agreed to meet the source's "uncle" in Colorado on July 18, 2024 to sell him the firearms, however, the day prior, told the source he would not be able to meet his uncle due to being in hospice with three weeks to live.  Gregory instead provided detailed instructions on the location and how to access the supposed mine shaft where the weapons were stored.  Investigators obtained a search warrant for the mine shaft, which was, in fact, located where Gregory had indicated, however, upon searching the location, determined that the mine shaft contained no firearms or other weaponry.

## II.    DISCUSSION

Following the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005), which rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid

unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

The Second Circuit reviews a sentence for reasonableness. *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *Id.* Here, there is no basis for the departure requested by defense counsel; rather, all of the relevant factors weigh in favor of a sentence at the top of the Guidelines range of twenty-seven months as contemplated by the Government. *See* 18 U.S.C. § 3553(a).[2]

The Government respectfully submits that for the reasons stated below, a balanced consideration of the section 3553(a) factors requires a sentence of a significant term of imprisonment at the top of the Guidelines range.

**A.      Nature and Circumstances of the Offense**

Gregory has been convicted of firearms trafficking, and more specifically, the sale and shipment of two firearms through the U.S. mail to a cooperating source in Connecticut. Gregory sold these firearms to the cooperating source knowing that the source was a prohibited person whose possession of firearms would constitute a felony. Indeed, the source advised him over text message that he could not purchase firearms because he was a felon, and that he was also seeking firearms to provide to his uncle and his "people." Gregory thereafter offered additional firearms and weapons to sell to the source and others, whom he believed to be members of a biker gang.

The inherent dangerous of the offense—the interstate shipment of firearms to a prohibited person—is undoubtedly serious. The unlawful and unregulated trafficking of firearms is prohibited

---

[2] The Government does not disagree that the enhancement applied by Probation for a weapon capable of accepting a high-capacity magazine applies, but will seek a *Fernandez* departure to honor the parties' plea agreement.

because it supplies unlicensed and prohibited persons with weapons, increasing the potential for and prevalence of violent crime, and further destabilizing communities and undermining public safety. Indeed, such trafficking facilitates violent crime as it puts firearms into the hands of those who are not only barred from possessing firearms due to prior convictions, active restraining orders, or other characteristics deemed by Congress to render an individual unfit to possess firearms, but who are actively attempting to circumvent the safeguards put in place by federal and state firearm regulations. When firearms are trafficked illegally and used to perpetrate crimes, regulators and law enforcement are also less able to track and interdict firearms used in such crimes, hampering investigations and the administration of justice. Such trafficking of firearms therefore erodes the integrity of federal and state firearms controls that are designed to d prevent firearms from ending up in the hands of dangerous individuals and protect the community.

The seriousness of this offense is further exacerbated by the presence of a semi-automatic weapon and high-capacity magazines, which allow shooters to fire multiple rounds of shots without reloading. Supplying these types of weapons to individuals who are already prohibited from possessing firearms only enhances the risk to the public safety and the community. A significant term of incarceration, followed by a term supervised release with robust conditions that will address the defendant's potential mental health issues, is necessary in light of the nature and characteristics of the offense.

### B.    History and Characteristics of the Defendant

The history and characteristics of the defendant are complex. The defendant's sentencing memorandum focuses on certain behaviors and beliefs that are consistent with potential mental health issues, possibly borne from a traumatic upbringing and life. However, while the Government acknowledges these potential mental health issues may exist and agrees that such

issues and background of a defendant should generally be considered in determining an appropriate sentence, the Government nevertheless questions the weight that should be assigned to such factors.

First, defendant's memorandum, and indeed the PSR, details a traumatic childhood and background that is unsupported by the record. In most instances, Probation has requested, but has not yet received any records corroborating events that supposedly occurred during Gregory's childhood and adult life. In some instances, Probation has confirmed that such records exist (pertaining to child safety records in California), and in others, that none exist (pertaining to hospital records in Arizona). Gregory also recounts tragic incidents – including the loss of three children – yet cannot recall sufficient details, such as their surnames or mothers' names, in order to verify his accounts. The Government the Court is therefore left to rely solely on the statements and recollection of a defendant, who in some instances has already been contradicted by fact and records. Indeed, in the defendant's sentencing memorandum, defense counsel strategically picks and chooses which portions of Gregory's history to characterize as real, *e.g.,* his traumatic childhood, and which to characterize as "eccentric beliefs that challenge reason," *e.g*., Gregory's stated intent to flee to Australia, again leaving the Government questioning what to even believe, let alone how to address such arguments.

Furthermore, as to defendant's mental health, Greogry had not received a formal diagnosis for any mental health condition. While Gregory includes a declaration[3] of Dr. Kathryn Thomas, a

---

[3] Attached to defendant's sentencing memorandum as Exhibit B.

licensed psychologist but also a part-time Research and Writing Attorney at the Federal Defender's Office ("FDO"), the value of this declaration should be discounted in this case for two reasons.

First, on its face, the declaration does not contain a mental health diagnosis. In this case, "[i]n [her] role at the Office of the Federal Public Defender," Attorney Thomas met with Gregory twice on March 4, 2025 and July 18, 2025, "with the goal of identifying treatment needs to aid in reentry planning," for a total of approximately three hours and forty minutes. Def. Mem. Exh. B ¶ 5. As a result of these two meetings, Attorney Thomas concluded that, given Gregory's self-reported "mental health challenges and expression of odd beliefs that appear consistent with delusions," he "will likely need extensive treatment to address his mental health needs." *Id*. at 12. She further recommended that Gregory undergo comprehensive evaluation to determine if he meets the criteria for a formal diagnosis of a delusional disorder. *Id.* ¶ 10. The Government does not dispute Attorney Thomas's general conclusions regarding the need for an evaluation and potential treatment – however, such conclusions do not amount to a formal diagnosis and should not be weighed as such.

Second, when considering the declaration, the Court should be aware of the two hats worn by Attorney Thomas and the possibility that her dual roles give rise to a personal conflict of interest. Her FDO biography states that "[a]s part of the mitigation team, Kathryn is passionate about supporting the mental health and well-being of clients and their families. She conducts psychological assessments (including cognitive and diagnostic assessments) and provides trauma-informed psychotherapy and case management services to clients who are incarcerated and on

supervised release. She is also passionate about incorporating social science research into legal memoranda and briefs."

Under Connecticut Rule of Professional Responsibility 1.7, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which exists if "there is a significant risk that the representation of one or more clients will be materially limited by ... a personal interest of the lawyer." Here, Attorney Thomas is employed part time as a research and writing attorney with the Federal Defender's Office, but at the same time is submitting a declaration on Gregory's behalf as a clinician with specialized training and qualifications. Thus, there is a risk that someone with Attorney Thomas's dual roles has an incentive to adjust or shade her assessment of the defendant's mental health status in a way that would be most favorable to the position advocated by the Federal Defender's Office in the criminal case. Any evaluation by Attorney Thomas should be considered with a full understanding of her dual roles and the potential conflict of interest triggered by those dual roles.   The government, in this case and previously in office-to-office discussions with the Federal Defender's Office, has raised this concern about Attorney Thomas's dual roles. The government understands that Attorney Thomas continues to evaluate and treat FDO clients and submit declarations on defendants' mental health conditions. The government therefore deemed it necessary to advise the Court of the proper context in which to consider the declaration, and how much weight to assign its conclusions.

Finally, while mental health concerns may help explain criminal conduct, they do not justify the conduct. Nor do they mitigate the inherent dangerousness in the conduct at issue here. Indeed, individuals experiencing untreated or unmanaged mental health conditions—in particular, delusions or impaired reality testing as may be the case here—may be at heighted risk of making

9

impulsive, dangerous, irrational decisions involving firearms.[4]  While studies show that the large majority of people with serious mental illnesses are never violent,[5] mental illness nevertheless has played a significant role in mass shootings and suicides, and increases the likelihood of a tragic outcome. Here, Gregory's eccentric and delusional beliefs, including what appears to be an inability to separate fact from fiction under certain circumstances, make Gregory uniquely unfit to safely handle or transfer firearms. These beliefs also suggest – and the defense appears to agree – that Gregory is in need of formal evaluation and potential mental health treatment which may be offered by the Bureau of Prison and required as part of his terms of supervised release.

Defendant also argues that a two-level reduction pursuant to Guidelines Section 2K2.1(b)(9)(C)(i) is warranted based on Gregory's mental condition which makes him "unusually susceptible to influence of others" and because he was "motivated by a familial relationship." Def. Mem. at 7.  With respect to Gregory's "mental condition," without a diagnosis, it is unclear how, if at all, Greogry's "mental condition" rendered him more "vulnerable to being persuaded or induced to commit the offense." While Attorney Thomas's declaration suggests that individuals with psychotic disorders are more susceptible to misleading information under social pressure due to impairments in cognitive functioning, it bears reiterating that Gregory, to date, has not received any such diagnosis for a psychotic disorder. Nor is there any suggestion how Gregory was specifically impacted by any such disorder, rendering him more vulnerable as a result of his condition to illegally selling and shipping firearms across state lines and into Connecticut.  Here,

---

[4] Indeed, the possession of firearm or ammunition by any person knowing or having reasonable cause to believe that such person "has been adjudicated as a mental defective or has been committed to any mental institution," is prohibited by federal law under 18 U.S.C. 922(d)(4).

[5] John S. Rozel and Edward P. Mulvey, *The Link Between Mental Illness and Firearm Violence: Implications for Social Policy and Clinical Practice,* ANN. REV. CLIN. PSYCHOLOGY, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC5784421/.

the absence of a formal diagnosis also underscores the need for a structured term of incarceration and supervised release with mandatory assessment, treatment, and supervision—not an unwarranted downward variance in his sentence, as defendant argues.

As to the latter, the suggestion that Gregory was motivated by a familial relationship is unfounded. The argument is based on the "familial relationship" to the mutual associate who introduced Gregory to the confidential source, and that mutual associate was a friend, at best, that, as Gregory details in his memorandum, he met through the online video game Call of Duty. Indeed, as this Court is aware, Gregory only met this associate in person for the first time after being charged and extradited to Connecticut. According to affidavits submitted by the mutual associate and his wife, they perceived the confidential source to be a threat, and now claim that their family was threatened to pressure Gregory to build firearms for the source who had connections to the Hells Angels. Gregory also claimed to have been threatened directly. Yet, as the defense admits, any such Facebook or text messages referencing these supposed threats or ties to the Hells Angels were, according to Gregory and the mutual associate, conveniently deleted or unsent,[6] leaving the Government and the Court again to rely on his word, which the defense already has conceded is unreliable.

What we do have, however, are the text communications between Gregory and the source, from which no fear or threats or intimidation can be gleaned, and during which Gregory appeared

---

[6] The Government has produced both screenshots of communications between the cooperating source and Gregory as well as an extraction of Gregory's phone to defense counsel in discovery, neither of which, in the Government's view, contain any purported threats.

to readily offer and ship marijuana, vape cartridges, and significantly, firearms and switches to the source – a source he now claims he feared.

Notably, as shown in Gregory's messages, Gregory told the source that 45s are "easy to build" and that he'll build the source "as many as I can." He offered to drive the weapons from Colorado to Connecticut and "bring enough to start a small war."



And, as depicted below, Gregory offered to drive switches to Connecticut to deliver to the source, and suggested that he had "all kinds of toys [the source's] uncle will love" including a "50 cal BMG I have to get at least $3,500 for that one" and other "rare guns and crazy ass shit."



When investigators learned that Gregory was planning to drive a shipment of firearms and other weapons across the country, given the risk and danger in that endeavor, investigators instructed the source to suggest a meeting in Colorado, where, according to Gregory, the firearms and other weapons were purportedly stored in a mine. The plan had been to introduce Gregory to an undercover agent, to mitigate the risk to the cooperating source and the public.  As evidenced

13

below, Gregory agreed to meet the source's contact in Colorado and bragged about having over

16,000 guns and 4 cannons and helping arm Mexican cartels.



Gregory ultimately cancelled the meeting, due to his being in hospice and receiving cancer

treatment, but nevertheless provided coordinates and instructions to the mine shaft where the

weapons were purportedly stored.

That this relationship motivated Gregory's sale and shipment of firearms to the confidential

source is contradicted by the communications between Gregory and the source, in which Gregory

actively and directly engaged with the source to sell firearms, ammunition, and switches, offering

14

to sell and distribute even more than was initially sought, and a further downward departure or variance on this basis is unwarranted. Instead, a significant sentence of incarceration, followed by supervised release with robust conditions that ensure mental health evaluation, treatment if needed, and compliance, would reflect the seriousness of the offense and balance the Section 3553(a) goals of deterrence, rehabilitation, and the safety of the community.

## III.    CONCLUSION

For the reasons stated above, the Government submits that a twenty-seven month sentence at the top the Guidelines range contemplated by the Government followed by a term of supervised release with conditions that would ensure mental health evaluation and treatment if needed, is appropriate in light of all the section 3553(a) factors and is sufficient, but not greater than necessary, to meet the goals of sentencing.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY


/s/ *Stephanie T. Levick*
STEPHANIE T. LEVICK
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv20161
157 Church Street, 25th Floor
New Haven, CT 06510

15

<u>CERTIFICATION</u>

I hereby certify that on September 3, 2025, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Stephanie T. Levick*
STEPHANIE T. LEVICK
ASSISTANT UNITED STATES ATTORNEY

16